# Exhibit 2

```
 1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF NEW YORK
 2            MASTER DOCKET 18-MD-2865(LAK)
              CASE NO. 18-CV-09797
 3
    _____
 4                                         )
    IN RE:                                 )
 5                                         )
    CUSTOMS AND TAX ADMINISTRATION OF      )
 6  THE KINGDOM OF DENMARK                 )
    (SKATTEFORVALTNINGEN) TAX REFUND       )
 7  SCHEME LITIGATION                      )
                                           )
 8  _____)

 9

10

11

12              C O N F I D E N T I A L

13

14

15    REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

16                  EXAMINATION OF

17                  GUNNAR VOLKERS

18              DATE: June 8, 2021

19

20

21

22

23

24

25        REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

CONFIDENTIAL
Gunnar Volkers - June 8, 2021

```
 1     G U N N A R   V O L K E R S,

 2            called as a witness, having been first

 3     duly sworn according to law, testifies as follows:

 4

       EXAMINATION BY MR. OXFORD:

 5

 6       Q    Good afternoon, Mr. Volkers?

 7       A    Good afternoon.

 8       Q    How are you today?

 9       A    I'm fine.  How are you?

10       Q    So, fine.  Could you please state

11     your full name for the record?

12       A    My name is Gunnar Volkers.

13       Q    Spell that for the court reporter,

14     please.

15       A    First name G-U-N-N-A-R, surname,

16     V-O-L-K-E-R-S.

17       Q    Thank you.

18            Are you currently employed by North

19     Channel Bank?

20       A    Yes, I am.

21       Q    What is your -- what is your

22     position with North Channel Bank?

23       A    I'm a managing director of North

24     Channel Bank since January 9, 2017.  My

25     responsibilities are risk and regulatory
```

```
1        A    Yeah, I do.
2             (Whereupon a discussion was held
3    off the record.)
4        Q    Sir, so we're clear, do you have
5    the Omineca reclaim application in front of
6    you?
7        A    Yes, I have, yeah.
8        Q    Did NCB generate some of the
9    documents that are attached to this
10   application?
11       A    All the documents that carry the
12   logo of North Channel Bank have been produced
13   by North Channel Bank.
14       Q    And what are those documents
15   called?
16       A    These are dividend credit advices,
17   "DCAs" we call them.  And they show, as is
18   normal, how many shares are held of which
19   company at -- and also, of course, what
20   advice in or other reference to the stock
21   exchange there might be.
22            Then, in this case, it is advising
23   the dividend payment that on -- in this
24   particular case, it's regarding Coloplast,
25   dated the 14th of May in '14.  It shows how
```

CONFIDENTIAL
Gunnar Volkers - June 8, 2021

```
 1    high the dividend is, which is four kroner
 2    per share, and it shows also the 700,000
 3    shares were their holdings at the 8th of May,
 4    which is important because the ex date for
 5    registering for the dividend is on the 9th of
 6    May.  The dividend details are -- are
 7    mentioned.
 8            And since it's a Danish company
 9    that pays its dividends in Danish kroner, and
10    since North Channel Bank does not have any
11    currency accounts except for dollar and Euro,
12    there's an exchange rate there because the --
13    those monies received or monies in foreign
14    currency will always be reflected in Euros in
15    our books.
16       Q    Did NCB perform a thorough search
17    of its records to determine whether NCB, in
18    fact, held 700,000 shares of Coloplast on
19    May 8, 2014 for its customer, the Omineca
20    Pension Plan?
21       A    Indeed, we did look into that, and
22    we came to the conclusion that the bank did
23    not, at any time, hold any shares in the
24    setup that has been made.  I can actually say
25    that the way the structure had been designed,
```

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

```
 1    the pension plan as well as the broker as

 2    well as the sellers of the shares, they were

 3    always short sellers, were all customers in

 4    the bank.

 5            And in this connection, it was like

 6    creating a closed shop where the input into

 7    the custody system of the bank that was

 8    supported by DWP Bank as the system provider,

 9    it didn't need anything else than giving in

10    the ISO number and an amount of shares.  And

11    they were netted out at the end of the day

12    because that is how it was set up.

13            The short seller would sell by

14    other broker to the pension plan.  And if you

15    take all this within one day within the same

16    bank, you would have it in the same custody

17    system and it adds up to zero.

18       Q    So was the statement on this

19    dividend credit advice that the Omineca plan

20    held 700,000 shares of Coloplast May 8, 2014

21    true or false?

22            MR. BAHNSEN:  Objection to the

23       form.

24       A    I see this as a falsification, as

25    do my colleagues.
```

1      Q    There's a section on the credit

2    advice.  I think you covered this earlier.

3           It says "dividend income" and

4    there's a number of 2.8 million Danish

5    krones.

6           Do you see that?

7      A    Yes.

8      Q    And what does that mean?

9      A    Well, it means that 700,000 shares

10   of Coloplast yielding four Danish kroner ends

11   up in a dividend -- I will repeat.

12          I said that that 700,000 shares,

13   yielding four Danish kroner per unit add up

14   to 2.8 million as a cross dividend income.

15   Then you have the withholding tax of

16   27 percent that is shown here on the credit

17   advice, and that is -- and only shown in

18   Euro.

19          So if we take the Euro amounts, the

20   gross dividend income in Euro was 374,000.

21   The withholding tax was 101,000.  The actual

22   net that should be credited over to Omineca

23   was then $273,000.

24     Q    Did NCB perform a thorough search

25   of its records to determine whether NCB

Page 22

```
1     received a dividend in the amount of 273,094
2     Euros and 9 cents in connection with Omineca
3     plan's purchase of Coloplast shares in May of
4     2014?
5          A    We have gone through our ledger in
6     '14 and in '15 in search of dividend payments
7     and in search of payments for the acquisition
8     of shares.  And we have not found any such
9     payments, neither ingoing nor outgoing.
10         Q    So is the -- where the dividend
11    credit advice represents that there was an
12    actual payment or dividend payment for
13    Coloplast shares to the Omineca plan in the
14    sum of 273,094 Euros and 9 cents, is that
15    true or false?
16              MR. BAHNSEN:  Objection to form.
17         A    There have been no physical
18    payments in this structure.  I've mentioned
19    it before.  I called those up.
20              These are only bookings.
21         Q    So there was no real
22    world -- withdrawn.
23              Was there any real world cash
24    movement in connection with this dividend
25    credit advice?
```

```
 1        A     There has been going in or out of

 2     the bank —— I said no liquidity in terms of

 3     money has been flowing in or out of the bank.

 4        Q     Turning to the next credit advice,

 5     sir, the second one is dated April 4, 2014.

 6              Do you see that?

 7        A     Yes.

 8        Q     It states that the Omineca plan

 9     received a dividend of 1.870357.51 million

10     Euros on 10,000 shares of Maersk, from which

11     504,996 Euros and 53 cents was withheld as

12     tax, resulting in an actual payment of

13     1.3653098 million Euros.

14              Do you see that?

15        A     Yeah.  But I would object to the

16     actual payment, because that would indicate

17     that there has been a transaction —— a

18     payment transaction.  This is not the case

19     that only the internal bookings on the

20     accounts —— I said I objected to the

21     payment ——

22        Q     The term "actual payment" ——

23        A     The term "actual payment," because

24     there were no actual payments.  There were

25     only internal bookings.
```

CONFIDENTIAL
Gunnar Volkers - June 8, 2021

1              There were no transactions.

2         Q    So my next question was:  Did NCB

3    search its records for evidence of the

4    Omineca Pension Plan -- let me restart the

5    question again.

6              Did NCB search its records for

7    evidence of the Omineca Pension Plan's

8    purchase of A.P. Moeller-Maersk shares in

9    March of 2014?

10        A    Yes, we did.

11        Q    Did NCB, in fact, hold 10,000

12   shares of A.P. Moeller-Maersk on behalf of

13   the Omineca Pension Plan in March of 2014 as

14   described on this dividend credit advice?

15             MR. BAHNSEN:  Object to form.

16        A    No.  No real shares were held.

17        Q    Did NCB search its records for

18   evidence of the receipt of any dividend

19   income in April 2014 in connection with the

20   Omineca Pension Plan's purchase of

21   A.P. Moeller-Maersk shares?

22        A    Yes, we did.

23        Q    Did NCB, in fact, receive any

24   dividend income on Maersk shares as described

25   in this dividend credit advice?

CONFIDENTIAL
Gunnar Volkers - June 8, 2021

1          MR. BAHNSEN:  Objection to form.

2      A    No payments of this size were seen

3   and no transaction of this size has taken

4   place.

5      Q    So is this dividend credit advice

6   true or false?

7      A    It is not reflecting the truth, so

8   we see it as a falsification.

9      Q    Turning to the third dividend

10  credit advice, it's dated March of 2014.

11  March 26, 2014.

12          Do you see that?

13     A    Yes.

14     Q    And this states, does it not, that

15  the Omineca Pension Plan received a dividend

16  of 7,514,728.87 million Euros on 12.5 million

17  shares of Novo Nordisk from which two

18  point -- sorry -- 2.028976 and 79 cents

19  million Euros was withheld as tax, resulting

20  in a payment of 5,485,752 Euros and 8 cents.

21          Do you see that?

22     A    I see that.

23     Q    Did NCB search its records for

24  evidence of the Omineca Pension Plan's

25  purchase of Novo Nordisk shares in March of

1    2014?

2         A    Indeed we did.

3         Q    Did NCB, in fact, hold 12.5 million

4    shares of Novo Nordisk on behalf of the

5    Omineca Pension Plan in March of 2014 as

6    described in this dividend credit advice?

7              MR. BAHNSEN:  Object to form.

8         A    No, NCB did not hold Novo Nordisk

9    shares.

10        Q    Did NCB search its records for

11   evidence of the receipt of any dividend

12   income in connection with the Omineca plan's

13   purchase of Novo Nordisk shares in March of

14   2014?

15        A    We did.

16        Q    And did NCB, in fact, receive the

17   dividend income on Novo Nordisk shares as

18   described in this dividend credit advice?

19             MR. BAHNSEN:  Object to the form.

20        A    No.

21        Q    Is this dividend credit advice true

22   or false?

23        A    It does not reflect the reality.

24   It's a falsification.

25        Q    Turning to the fourth dividend

CONFIDENTIAL
Gunnar Volkers – June 8, 2021

```
 1    credit advice for Omineca, it's dated

 2    March 25, 2014.

 3              Do you see that?

 4       A    I see it.

 5       Q    This states that the Omineca plan

 6    received a dividend of 477,641 Euros and

 7    5 cents on 550,000 shares of Pandora from

 8    which 128,963 Euros, 8 cents was withheld,

 9    resulting in an actual payment of 348,677

10    Euros and 97 cents.

11              Do you see that?

12       A    I see that.

13       Q    Did NCB search its records for

14    evidence of the Omineca plan's purchase of

15    Pandora shares in March of 2014?

16       A    We did.

17       Q    Did NCB, in fact, hold 550,000

18    shares of Pandora on behalf of the Omineca

19    plan in March of 2014 as described in the

20    dividend credit advice?

21              MR. BAHNSEN:  Object to form.

22       A    NCB did not hold any Pandora shares

23    and not for Omineca either.

24       Q    Did NCB search its records for

25    evidence of the receipt of any dividend
```

CONFIDENTIAL
Gunnar Volkers - June 8, 2021

1    income in connection with the Omineca plan's

2    purchase of Pandora shares in March of 2014?

3        A    Yes, we did.

4        Q    Did NCB, in fact, receive the

5    dividend income on Pandora shares as

6    described in this credit advice?

7            MR. BAHNSEN:  Object to form.

8        Q    So the question is:  Did NCB, in

9    fact, receive dividend income on Pandora

10    shares as described in this dividend credit

11    advice?

12            MR. BAHNSEN:  Same objection.

13        A    This is not the case.

14        Q    So was this dividend credit advice

15    true or false?

16            MR. BAHNSEN:  Objection.

17        A    It's not true.

18        Q    The fifth and final dividend credit

19    advice for Omineca, the Omineca plan, is

20    dated April 9, 2014.

21            Do you see that?

22        A    Yes.

23        Q    This represents that the Omineca

24    plan received a dividend of 587,897 Euros, 41

25    cents on 130 -- sorry -- 163,000 shares of

CONFIDENTIAL
Gunnar Volkers – June 8, 2021

1    Tryg, T-R-Y-G, from which 158,732 Euros,

2    30 cents was withheld as tax, resulting in an

3    actual payment of 429,165 Euros and 11 cents.

4            Do you see that?

5        A    I do.

6        Q    Did NCB search its records for

7    evidence of the Omineca Pension Plan's

8    purchase of Tryg shares in April of 2014?

9        A    We did.

10       Q    Did NCB, in fact, hold 163,000

11   shares of Tryg on behalf of the Omineca

12   Pension Plan in April 2014 as described in

13   this dividend credit advice?

14           MR. BAHNSEN:  Object to the form.

15       A    The bank did not hold any Tryg

16   shares and not for Omineca either.

17       Q    Did NCB search its records for

18   evidence of the receipt of any dividend

19   income in connection with the Omineca plan's

20   purchase of Tryg shares from 2014?

21       A    Yes, we did.

22       Q    And did NCB, in fact, receive the

23   dividend income on Tryg shares as described

24   in this dividend credit advice?

25           MR. BAHNSEN:  Object to the form.

CONFIDENTIAL
Gunnar Volkers - June 8, 2021

```
 1        A     This is not the case.

 2        Q     So is this dividend credit advice

 3   true or false?

 4              MR. BAHNSEN:  Objection.

 5        A     It is not true.  We see it as a

 6   falsification.

 7        Q     That's all I have for that exhibit

 8   at this time.

 9              Can I ask you to turn to Tab 4 of

10   your binder, which is Exhibit 3203, the

11   Vanderlee application reclaims?

12              (Whereupon the above mentioned was

13         marked for Identification.)

14        Q     This is two applications submitted

15   by the Vanderlee Technologies Pension Plan in

16   May of 2014.

17              Can you tell me if the documents on

18   Page 4 and 12 through 16 of the exhibit are

19   generated by NCB?

20        A     The dividend credit advices that

21   carry the logo of the bank are -- have been

22   created by the bank.

23        Q     And they were generated for

24   Vanderlee Technologies Pension Plan.

25              Right?
```

```
1       A    That is correct.
2       Q    Now, turning to the first of these,
3   dated May 14, 2014.
4            Do you see that?
5       A    Yes.
6       Q    Okay.  This credit advice states
7   that the Vanderlee Technologies Pension Plan
8   received a dividend of 411,511 Euros, 64
9   cents, for 770,000 shares of Coloplast, from
10  which 111,108 Euros and 14 cents was withheld
11  as tax, resulting in an actual payment of
12  300,403 Euros and 50 cents.
13           Do you see that?
14      A    I do.
15      Q    Did NCB search its records for
16  evidence of the Vanderlee Technologies
17  Pension Plan's purchase of Coloplast shares
18  in May of 2014?
19      A    We did do so.
20      Q    Did NCB, in fact, hold 770,000
21  shares of Coloplast on behalf of the
22  Vanderlee Technologies Pension Plan as
23  described in the dividend credit advice?
24           MR. BAHNSEN:  Object to the form.
25           MS. RICE:  Objection.
```

CONFIDENTIAL
Gunnar Volkers - June 8, 2021

```
 1       A     The bank never held any shares of
 2    Coloplast, not for Vanderlee Technologies
 3    Pension Plan, either.
 4       Q     Did NCB search its records for
 5    evidence of the receipt of any dividend
 6    income in connection with the Vanderlee
 7    Technologies Pension Plan's purchase of
 8    Coloplast shares in May of 2014?
 9       A     We did so.
10       Q     Did NCB, in fact, receive the
11    dividend income on Coloplast shares as
12    described in this dividend credit advice?
13       A     No.
14             MR. BAHNSEN:  Objection.
15             MS. RICE:  Objection.
16       Q     Sir, is this dividend credit advice
17    true or false?
18             MR. BAHNSEN:  Objection.
19             MS. RICE:  Objection.
20       A     It's not true.  It does not reflect
21    the reality.
22       Q     Turning, if I could, sir, to
23    Page 12 of the exhibit?  Could you
24    turn -- you should have some Bates numbers at
25    the bottom right-hand side.  887 is the last
```

1    number.

2         Do you have that?

3    A    I have it.

4    Q    And that's the March 24, 2014

5    dividend credit advice?

6    A    Yes.

7    Q    And that states that the Vanderlee

8    Technologies Pension Plan received a dividend

9    of 1,309,320 Euros and 22 cents on

10   4.9 million shares of Danske Bank, from which

11   353,516 Euros and 46 cents was withheld as

12   tax, resulting in an actual payment of

13   955,803 Euros and 76 cents.

14        Correct?

15   A    That's correct.

16   Q    Did NCB search its records for

17   evidence of the Vanderlee Technologies

18   Pension Plan's purchase of Danske Bank shares

19   in March of 2014?

20   A    We did.

21   Q    Did NCB, in fact, hold 4.9 million

22   shares of Danske Bank on behalf of the

23   Vanderlee Technologies Pension Plan as

24   described in this credit advice?

25        MS. RICE:  Objection.

CONFIDENTIAL
Gunnar Volkers - June 8, 2021

1      A    The bank did not hold any Danske

2    Bank shares at any time and not for Vanderlee

3    either.

4      Q    Did NCB search its records for

5    evidence of the receipt of any dividend

6    income in connection with the Vanderlee

7    Technologies Pension Plan's purchase of

8    Danske Bank shares in March of 2014?

9      A    Yes, we did.

10      Q    And did NCB receive the dividend

11    income on Danske Bank shares as described in

12    this dividend credit advice?

13      A    No.

14          MS. RICE:  Objection.

15      Q    Is this dividend credit advice true

16    or false?

17          MS. RICE:  Objection.

18      A    We see it as a falsification.

19      Q    Turning to the next number ending

20    Bates 888, you have the March 25th dividend

21    credit advice relating to Pandora.

22          Does this state that the Vanderlee

23    Technologies Pension Plan received a dividend

24    of 596,617 Euros and 10 cents on 687,000

25    shares of Pandora, from which 161,086 Euros

CONFIDENTIAL
Gunnar Volkers - June 8, 2021

Page 35

1    and 62 cents was withheld as tax resulting in

2    an actual payment of 435,530 Euros and

3    48 cents.

4           Do you see that, sir?

5    A    Yes, I do.

6    Q    Did NCB search its records for

7    evidence that the Vanderlee Technologies

8    Pension Plan purchased those Pandora shares

9    in March?

10   A    We did.

11   Q    Did NCB, in fact, hold 687,000

12   shares of Pandora on behalf of the Vanderlee

13   Technologies Pension Plan in March of 2014 as

14   described in this dividend credit advice?

15          MS. RICE:  Objection.

16   A    The bank didn't hold any Pandora

17   shares at any time.  Not for Vanderlee,

18   either.

19   Q    Did NCB search its records for

20   evidence of the receipt of any dividend

21   income in connection with the Vanderlee

22   Technologies Pension Plan's purchase of

23   Pandora shares in March of 2014?

24   A    We did.

25   Q    And did NCB, in fact, receive the

CONFIDENTIAL
Gunnar Volkers - June 8, 2021

```
 1    dividend income on Pandora shares as

 2    described in this dividend credit advice?

 3         A    No payments were received.

 4         Q    So is this dividend advice true or

 5    false?

 6              MS. RICE:  Objection.

 7         A    It does not reflect the realities,

 8    so we see it as a falsification.

 9         Q    Okay.  All right.

10              Turning to the next dividend credit

11    advice, which is dated March 26th of 2014

12    relating to Novo Nordisk.

13              Do you see that, sir?

14         A    I do.

15         Q    And it states that the Vanderlee

16    Technologies Pension Plan received a dividend

17    of 8,416,496 Euros, 33 cents on 14 million

18    shares of Novo Nordisk, from which 2,272,454

19    Euros and 1 cent was withheld as tax,

20    resulting in an actual payment of 6,144,042

21    Euros and 32 cents.

22         A    I see that.

23         Q    Did NCB search its records for

24    evidence of the Vanderlee Technologies

25    Pension Plan's purchase of Novo Nordisk
```

CONFIDENTIAL
Gunnar Volkers - June 8, 2021

1    shares in March of 2014?

2        A    We did.

3        Q    Did NCB, in fact, hold 14 million

4    shares of Novo Nordisk on behalf of the

5    Vanderlee Technologies Pension Plan in March

6    of 2014 as described on the dividend credit

7    advice?

8            MS. RICE:  Objection.

9        A    The bank never held any Novo

10   Nordisk shares.  Not for Vanderlee

11   Technologies either.

12       Q    Did NCB search its records for

13   evidence of the receipt of any dividend

14   income in connection with the Vanderlee

15   Technologies Pension Plan's purchase of Novo

16   Nordisk shares in March of 2014?

17       A    Indeed we did.

18       Q    And did NCB, in fact, receive the

19   dividend income on Novo Nordisk shares as

20   described in this dividend credit advice?

21           MS. RICE:  Objection.

22       A    It's not -- this is not the case.

23       Q    So was this dividend credit advice

24   true or false?

25       A    It is false.

1          MS. RICE:  Objection.

2     Q    The next dividend credit advice is

3   dated April 4, 2014, and relates to

4   A.P. Moeller-Maersk.

5          Do you see that?

6     A    Yes.

7     Q    It states that the Vanderlee

8   Technologies Pension Plan received a dividend

9   of 2,197,670 Euros and 7 cents on 11,750

10  shares of A.P. Moeller-Maersk, from which

11  593,370 Euros and 92 cents was withheld as

12  tax, resulting in an actual payment of a

13  hundred and -- 1,604,299 Euros and 15 cents.

14         Do you see that?

15    A    Yes, I do.

16    Q    Did NCB search its records for

17  evidence of the Vanderlee Technologies

18  Pension Plan's purchase of A.P.

19  Moeller-Maersk shares in March of 2014?

20    A    Yes, we did.

21    Q    Did NCB, in fact, hold 11,750

22  shares of Maersk on behalf of the Vanderlee

23  Technologies Pension Plan in March of 2014 as

24  described in this dividend credit advice?

25         MS. RICE:  Objection.

CONFIDENTIAL
Gunnar Volkers - June 8, 2021

1        A    At no time has -- have any

2   Moeller-Maersk shares been in its books and

3   not on behalf of Vanderlee, either.

4        Q    Did NCB search its records for

5   evidence of the receipt of any dividend

6   income in connection with the Vanderlee

7   Technologies Pension Plan's purchase of

8   Moeller-Maersk shares in March 2014?

9        A    Yes, we did.

10       Q    Did NCB, in fact, receive the

11  dividend income on Moeller-Maersk shares as

12  described in this dividend credit advice?

13            MS. RICE:  Objection.

14       A    No.

15       Q    So is this dividend credit advice

16  true or false?

17            MS. RICE:  Objection.

18       A    It is false.

19       Q    The next dividend credit advice is

20  dated April 9th of 2014.

21            Do you see that?

22       A    I see that.

23       Q    And it again relates to the Tryg

24  shares.

25            Correct?

CONFIDENTIAL
Gunnar Volkers — June 8, 2021

1      A      Correct.

2      Q      And this states that the Vanderlee

3   Technologies Pension Plan received a dividend

4   of 641,998 Euros and 40 cents on 178,000

5   shares of Tryg, from which 173,399 Euros,

6   57 cents was withheld as tax, resulting in an

7   actual payment of 468,658 Euros and 83 cents.

8            Do you see that?

9            MR. BAHNSEN:  Objection to the

10           form.  I think you may have misread one

11           of the numbers.

12           MR. OXFORD:  Okay. Well, just to

13           clear up that objection, which I

14           appreciate.

15     Q      Does this state that the Vanderlee

16   Technologies Pension Plan received a dividend

17   of 641,998 Euros and 40 cents on

18   108 -- sorry, 178,000 shares of Tryg, from

19   which 173,390 -- 339 Euros and 57 cents was

20   withheld as tax, resulting in an actual

21   payment of 468,658 Euros and 83 cents?

22     A      Yes, it states that.

23     Q      Did NCB search its records for

24   evidence of the Vanderlee Technologies

25   Pension Plan's purchase of Tryg shares in

1    April of 2014?

2        A    We did do so.

3        Q    Did NCB, in fact, hold 178,000

4    shares of Tryg on behalf of the Vanderlee

5    Technologies Pension Plan in April 2014 as

6    described in this dividend credit advice?

7            MS. RICE:  Objection.

8        A    The bank did at no time hold Tryg

9    shares, and not for Vanderlee, either.

10        Q    Did NCB search its records for

11    evidence of any receipt of any dividend

12    income in connection with the Vanderlee

13    Technologies Pension Plan's purchase of Tryg

14    shares in April of 2014?

15        A    Yes.

16        Q    Did NCB, in fact, receive the

17    dividend income on Tryg shares as described

18    in this dividend credit advice?

19            MS. RICE:  Objection.

20        A    No.

21        Q    So is this dividend credit advice

22    true or false?

23            MS. RICE:  Objection.

24        A    It is false.

25        Q    Let's go off the record for a

1    moment.

2            THE VIDEOGRAPHER:  Please stand by.

3        The time is 8:09 a.m. New York time and

4        we're going off the record.

5            (Brief recess taken.)

6            THE VIDEOGRAPHER:  Stand by.  The

7        time is 8:25 a.m. New York time and

8        we're back on record.

9        Q    Mr. Volkers, do you have in front

10   of you Exhibit 3203, Page 4?  It should be a

11   North Channel Bank dividend credit advice

12   from May 14th of 2014.

13       A    I have one regarding Vanderlee and

14   Coloplast shares.

15       Q    Great.  We're on the same -- we're

16   on the same page.

17            And does this state that Vanderlee

18   Technologies Pension Plan received a dividend

19   of 411,511 Euros and 64 cents on 7,700 shares

20   of Coloplast, from which 111,108 Euros and

21   14 cents was withheld as tax, resulting in a

22   payment of 300,403 Euros and 50 cents?

23       A    It does, except for the fact that

24   it is not 7,700 shares, but 770,000 shares.

25       Q    Pardon me.  Thank you for that

CONFIDENTIAL
Gunnar Volkers — June 8, 2021

1    correction.

2            Did NCB search its records for

3    evidence of the Vanderlee Technologies

4    Pension Plan's purchase of Coloplast shares

5    in May of 2014?

6        A    Yes, we did.

7        Q    Did NCB, in fact, hold 770,000

8    shares of Coloplast on behalf of the

9    Vanderlee Technologies Pension Plan?

10           MS. RICE:  Objection.

11       A    The bank did not at any time hold

12   Coloplast shares and not for Vanderlee,

13   either.

14       Q    And did NCB search its records for

15   evidence of the receipt of any dividend

16   income in connection with the Vanderlee

17   Technologies Pension Plan's purchase of

18   Coloplast shares in 2014 -- in May of 2014?

19       A    Yes, we did.

20       Q    Did NCB, in fact, receive dividend

21   income on Coloplast shares in May of 2014?

22           MS. RICE:  Objection.

23       A    No, we did not.

24       Q    Is this dividend credit advice true

25   or false?

CONFIDENTIAL
Gunnar Volkers - June 8, 2021

```
 1              MS. RICE:  Objection.

 2       A     It is false.

 3       Q     So just -- I think that's the end

 4   of all 11 dividend credit advices.

 5              But just so we have a very clear

 6   record, did NCB hold the shares identified on

 7   the dividend credit advices we looked at in

 8   Exhibit 3202 that's relating to Omineca?

 9              MR. BAHNSEN:  Objection.

10       A     The bank did not hold any of these

11   shares.

12       Q     Did NCB receive any dividends in

13   connection with the shares identified in the

14   dividend credit advices in Exhibit 3202?

15       A     No.

16       Q     Turning back just quickly to

17   Exhibit 3203, the -- all the shares

18   identified in the dividend credit advices --

19   did NCB hold the shares identified in the

20   dividend credit advices contained within

21   Exhibit 3203, which is Tab 4 of your binder?

22              MS. RICE:  Objection.

23       A     We did not receive any dividends.

24       Q     My question was -- I was about to

25   ask that question, but I was asking about
```

CONFIDENTIAL
Gunnar Volkers - June 8, 2021

```
 1    shares.  So let me just be clear.

 2            Did NCB hold the shares identified

 3    in the dividend credit advices in

 4    Exhibit 3203?

 5            MS. RICE:  Objection.

 6      A     The bank did not hold any shares as

 7    described in the credit advices, and thus not

 8    any dividends either.

 9      Q     Okay.  That's good.  Thank you.

10            Can I ask you to turn to Tab 5 of

11    your binder, 3204?

12            MR. OXFORD:  Mark 3204.

13            (Whereupon the above mentioned was

14        marked for Identification.)

15      Q     On the first page of which is an

16    e-mail from Sam Redell, R-E-D-E-L-L, to you

17    amongst others.

18            Can you tell me, please, who

19    Mr. Redell is?

20      A     Sam Redell is a member of the

21    management group, the operations manager, and

22    is also in charge of all settlement from our

23    treasury and trading department.

24      Q     Did Mr. Redell perform a search of

25    NCB's books and records at your direction?
```

1    long and short Danske Bank positions on this

2    Excel spreadsheet --

3         A    Then there are no shares.

4         Q    And is that the reason that -- is

5    that one of the reasons you testified earlier

6    that these statements on the dividend credit

7    advices, the share holdings by these two

8    plans, were false?

9         A    That's correct.

10        Q    Just then focusing on Column F, the

11   "Credit Amount," ignoring the bottom German

12   security on here, Dinler, which is a German

13   share, for any individual security, is it

14   correct to say that the amount of

15   dividend-related credits and debits, Column

16   F, net to zero?

17        A    It's correct.

18        Q    So back to Column F, Row 74.

19             Does this purport to show that the

20   Omineca plan received credit of 348,677 Euros

21   and 97 cents related to its 550,000 shares of

22   Pandora?

23        A    Let me put it this way.  If it

24   weren't fictitious shares, this would have

25   been the case.  But there were no shares,

1    they were fictitious.

2         Therefore, there has not been any

3    real money credited to the account.

4         Q    And if we were to then add up all

5    of the credits and debits -- withdrawn.

6         If you add up all the March 25,

7    2014 credits and debits related to Pandora

8    shares on Column F, the amount sums to

9    .01 Euros.

10        Correct?

11        A    Yes.  It was apparently a rounding.

12        Q    It's not the case that NCB actually

13   received 1 cent relating to this Pandora --

14        A    I suspect that they're surrounding

15   it in the spreadsheet.

16        Q    And then, just one more example.

17        Row 104, does Column F purport to

18   show that the Vanderlee Technologies Pension

19   Plan received a credit of 955,000 -- excuse

20   me -- 802 Euros and 76 cents related to its

21   4.9 million shares of Danske Bank?

22        A    It's an analogy of what we just

23   said.  There have not been any real shares

24   and there has not been any real dividend

25   payment.  So it would not exist.

```
 1      A    Yes.

 2      Q    Can you describe for us what this

 3  is?

 4      A    Well, it's the transcript of the

 5  Gloucester Court court book from

 6  September 23rd in 2019.  I represented the

 7  bank in a criminal case that was negotiated

 8  in front of the judge, where it was the

 9  Prosecutor Office against the bank.

10           The bank was charged for serious --

11  for collusive serious fraud against the

12  Danish state.  And we accepted that, and they

13  pleaded guilty on behalf of the bank.

14      Q    And does the -- does Exhibit 3205

15  accurately reflect the facts of the fraud to

16  which you pleaded guilty on behalf of NCB?

17           MR. BAHNSEN:  Objection to form.

18      A    It's reflected in headlines, I

19  would say.  Because it doesn't really go very

20  deep into what motivated us.  But the setup

21  of the business was extremely unusual.

22           We knew already that in Germany,

23  since 2012, cum ex was strongly prohibited.

24  And that, of course, makes it a little bit

25  more cautious at what has been done here.
```

CONFIDENTIAL
Gunnar Volkers - June 8, 2021

1    course, increased our interest in what was

2    going on here.

3                So the bank then did get monies,

4    but they actually also -- and that was

5    criticized by the regulator, indeed -- they

6    also gave credits, facilities to some of the

7    plans, not all.  And so it was prefinanced

8    until the monies that finally were received

9    came in.  And that's the breaking point.

10               The monies -- the only monies we

11   saw coming in were amounts from the tax

12   reclaim agency in London.  That was real

13   money coming in.  This could cover the

14   credits, this could cover also the fees that

15   the bank claimed from the pension plans.

16               And that led to the conclusion that

17   the dividend credit advices were produced

18   only for one single reason, to show amounts

19   deducted from the gross dividend as

20   withholding tax to be presented via the tax

21   reclaim agencies to Danish and also Belgian

22   tax authorities, and under the double tax

23   treaty regulation to reclaim taxes paid.

24               Since there have not been any

25   dividends, there have not been any taxes

```
 1    paid, there was no reason for reclaiming

 2    anything.  We were convinced that this is

 3    fraud and that the bank was deeply involved

 4    in the setup of a fraudulent business.

 5              MR. BAHNSEN:  Objection to the

 6         narrative.

 7         Q    Did the collusive serious fraud

 8    against the Danish state that you described

 9    include false reclaims made on behalf of the

10    Omineca Pension Plan?

11              MR. BAHNSEN:  Object to form.

12         A    Yes.

13         Q    And did the collusive serious fraud

14    against the Danish state include false

15    reclaims made on behalf of the Vanderlee

16    Technologies Pension Plan?

17              MS. RICE:  Objection.

18         A    Yes.

19              MR. OXFORD:  Let's go off the

20         record.

21              THE VIDEOGRAPHER:  Stand by.  The

22         time is 9:23 a.m. New York time and

23         we're going off the record.

24              (Whereupon a discussion was held

25         off the record.)
```

```
 1                (Brief recess taken.)

 2                THE VIDEOGRAPHER:  Stand by.  The

 3        time is 9:42 a.m. New York time and

 4        we're back on record.

 5        Q    Mr. Volkers, I think you have a

 6    KPMG report, which is Exhibit 3206 in your

 7    binder.  It's Tab 6.  I'm sorry.  It's Tab 7.

 8                But I think you have it?  Do you?

 9        A    Yeah.

10        Q    Okay.  And can I ask you to find

11    at -- towards the back of it, there's an

12    Annex 2.2.  And it appears the Bates numbers

13    will help you find it.  It's at 0 -- it

14    starts at 0139.

15                Are you familiar with the slides

16    here at Annex 2.2 of the KPMG report?

17        A    Yes, I am.  This is a Vizio

18    presentation made by one of the employees,

19    Daniella Menso, in order to visualize the

20    business procedures that were to be set up

21    and that in part also were set up.

22                It shows, actually in a very nice

23    way, how the transactions and all steps are

24    to be done.  So it's visualized, it' -- it

25    gives an easy overview of the setup.  And
```

CONFIDENTIAL
Gunnar Volkers - June 8, 2021

1    having in mind what I said before, you can

2    easily recap that the whole setup only works

3    because all parties involved are customers at

4    the bank, which makes it possible only to

5    enter bookings, not on -- based on real

6    transactions, and to book across the

7    different accounts no matter what kind of

8    security, no matter even for -- for pledged

9    monies.  They are also in book money.  Then

10   you will see they always end up in a zero.

11           And this is a clearly circular

12   setup.  This is intended and this works only

13   because all parties involved agree on how

14   this has to be done.

15           MR. BAHNSEN:  Objection.

16   A    And this includes persons from --

17   well-known external persons known by the

18   shareholders.  They have, as to, as far as I

19   know, also a clear relationship to

20   Solo Capital, and the cum ex that has been

21   done out of there.

22           So this setup is then being refined

23   and put into a German setup with the DWP

24   Bank.  The overall setup, then, looks as you

25   see it here, and it has all been established